UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHELLE D. SNOVELLE, | ) | Case No. 06cv82-WQH (BLM) |
| Plaintiff, | ) | **ORDER DENYING PLAINTIFF'S** |
| | ) | **REQUEST FOR A *DE NOVO* HEARING** |
| v. | ) | **AND TO CONSIDER NEW EVIDENCE** |
| | ) | **AND** |
| MICHAEL J. ASTRUE, Commissioner of | ) | **REPORT AND RECOMMENDATION** |
| Social Security, | ) | **FOR ORDER GRANTING IN PART** |
| | ) | **PLAINTIFF'S MOTION FOR SUMMARY** |
| Defendant. | ) | **JUDGMENT AND DENYING** |
| | ) | **DEFENDANT'S CROSS-MOTION FOR** |
| ———————————————— | ) | **SUMMARY JUDGMENT** |
| | | **[ECF Nos. 44 & 50]** |

Plaintiff Michelle D. Snovelle brought this action for judicial review of the Social Security Commissioner's (Commissioner) denial of her application for disability insurance benefits and supplemental security income.  Before the Court are Plaintiff's Motion for Summary Judgment (ECF No. 44) and Defendant's Cross-Motion for Summary Judgment (ECF No. 50).

This Report and Recommendation is submitted to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California.  For the reasons set forth below, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** and Defendant's Cross-Motion for Summary Judgment be **DENIED.**

## PROCEDURAL BACKGROUND

On April 28, 2003, Plaintiff applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  Administrative Record (AR) at

3, 94-97.  Plaintiff alleged a disability onset date of November 9, 2001.  Id. at 94.  The Commissioner initially denied Plaintiff's application, and again upon reconsideration, resulting in Plaintiff's February 17, 2004 request for an administrative hearing.  Id. at 27-37.

On November 17, 2004, a hearing was held before Administrative Law Judge (ALJ) Jerry F. Muskrat  Id. at 14.  Ansar Haroun, M.D., a board-certified specialist in the field of psychiatry, John R. Morse, M.D., a diplomat of the American Board of Internal Medicine with a subspecialty in cardiovascular disease, Plaintiff, and a vocational expert (VE) testified at the hearing.  Id.  In a written decision dated February 2, 2005, the ALJ determined that Plaintiff was not disabled.  Id. at 14-24.  Plaintiff requested review by the Appeals Council, but this request was denied, making the ALJ's decision the final decision of the Commissioner.  Id. at 4-10; see also 20 C.F.R. § 404.981.

On January 13, 2006, Plaintiff filed the instant federal action.  ECF No. 1.  In February of 2007, the parties filed a joint motion to remand based on the fact that the Commissioner had not yet been able to locate the recording of the administrative hearing.  ECF No. 14.  The Commissioner represented that if the recording could not be located within a reasonable time, the Commissioner would remand the case to an ALJ for a *de novo* hearing.  Id.  On February 13, 2007, the district judge granted this request and remanded the matter to the Social Security Administration.  ECF No. 15.

On July 2, 2010, the district judge reopened the case in response to a request by the Commissioner wherein the Commissioner represented that he was prepared to file an administrative record of the underlying proceedings.  ECF Nos. 17, 18.  After having been granted five extensions of time in which to do so (totaling over five months of additional time), Plaintiff filed a motion for summary judgment on March 28, 2011.  ECF No. 44.  On May 23, 2011, Defendant filed a cross-motion for summary judgment and opposition to Plaintiff's motion.  ECF Nos. 50 & 53.  The Court granted Plaintiff's first request for an extension of time to oppose Defendant's cross-motion for summary judgment but denied Plaintiff's second request.  ECF Nos. 58 & 61.  While Plaintiff did not file an opposition to Defendant's cross-motion for summary judgment, she did filed a motion for remand.  ECF No. 63.  The motion for remand is addressed

in a separate order filed today.

**FACTUAL BACKGROUND**

**I.  Plaintiff's Education and Employment History**

Plaintiff was born on December 16, 1971, and was 29 years old on November 9, 2001, the alleged onset date of disability.  AR at 94.  Plaintiff has a high school education and completed one year of college.  Id. at 155 & 555.  Prior to her alleged disability, Plaintiff worked as a pizza maker, office clerk, secretary, waitress, cashier/receptionist, and most recently, as a field representative for the Department of Motor Vehicles.  Id. at 92, 114, 150, 555-63.

**II.  Plaintiff's Medical History**

In March of 2001, Plaintiff underwent a sleep study and was diagnosed as having a mild nocturnal obstruction.  Id. at 490.

On July 15, 2001, Plaintiff went to Kaiser Urgent Care complaining of low back pain.  Id. at 490.  She reported having no recollection of having recently increased her activity level or of suffering any trauma.  Id.  Lumbar muscle spasm was diagnosed and short courses of Motrin and Soma were prescribed.  Id.  About two weeks later, Plaintiff followed up with Tony Quan, M.D., regarding her back pain and it appears he prescribed Soma, Motrin, Prednizone, and Vicodin.  Id. at 491.  On August 9, 2001, Plaintiff saw John Goetz, M.D., and complained that the acute back pain was radiating from the lumbar area into the left buttock and posterior thigh, with associated numbness and tingling in the left calf and outer border of the left foot.  Id. at 487.  Dr. Goetz diagnosed an S1 radiculopathy (noting that the pathology most likely was at L4-5, though he did not have the x-rays yet), and recommended a cautious trial of press-ups, anti-inflammatory medication, and an epidural.  Id.  Plaintiff refused the epidural during the examination, stating that she wanted to think about the treatment.  Id.  There is no evidence in the record that she returned and received the epidural steroid.

During her initial consultation at Kaiser's Department of Psychiatry and Addiction Medicine on November 12, 2001, Plaintiff reported feeling depressed because of her health problems (citing back pain and sleep apnea).  Id. at 274-75.  A mood disorder, secondary to a medical condition, was diagnosed and Plaintiff was referred to a pain management program.  Id. at 277.  On

November 16, 2001, Plaintiff underwent a second sleep study, at which time moderal obstructive sleep apnea was diagnosed and a CPAP machine prescribed.  Id. at 483.  One month later, Plaintiff was taking Prozac and attending a Depression Group and Adjusting to Medical Illness Group.  Id. at 270.  On January 9, 2002, Plaintiff reported that the Prozac was not helping.  Id. at 268.

Michael Jaffe, D.O., conducted a physical medicine consultative examination on May 13, 2002, at which point Plaintiff complained of pain throughout her entire lumbar spine, with pain shooting down her left leg.  Id. at 458.  Dr. Jaffe concluded that Plaintiff had severe degenerative disc disease at L5-S1 (for her age) and might have a herniated disc.  Id. at 459.  He opined that a significant amount of her pain was coming from muscle dysfunction of the lumbar spine and that "contracture and deconditioning of the musculature ... is worsening her L5-S1 radicular syndrome."  Id.  He referred her for physical therapy and scheduled an appointment to review her upcoming MRI.  Id.  An MRI performed on May 15, 2002, showed "likely conjoint nerve root sheath involving left L5 and S1 never roots," a disc hernia encroaching at the same location, and "bilateral neural foramina mild to moderate stenosis."  Id. at 226.  Meanwhile, Plaintiff attended physical therapy and reported that the stretching exercises worked when she did them.  Id. at 424.

On October 8, 2002, Plaintiff consulted with a pain management specialist, Lisa Phillips, M.D., who ordered a lumbar diagnostic discogram to determine whether the L5-S1 disc was a source of pain.  Id. at 257-60.  Dr. Phillips also encouraged Plaintiff to swim laps and stretch in a warm water pool, and discussed the possible benefits of a referral for electrical acupuncture.[1]  Id. at 260.  Clinical notes indicate that someone diagnosed Plaintiff with fibromyalgia in November 2002, but it is unclear from the records who did so.  See id. at 253.  Between December 30, 2002 and February 10, 2003, Plaintiff received six electroacupuncture treatments from Farshad Ahadian, M.D.  Id. at 210-11, 215-16, 219, 222-25.  On January 24, 2003, one of Plaintiff's Kaiser

---

[1]  A few days later, Plaintiff underwent a third sleep study following reports of increased daytime fatigue. AR at 228.  The treating physicians increased her CPAP pressure.  Id.

physicians noted 16/18 tender points and a depressed affect with tearfulness, and diagnosed fibromyalgia and depression. Id. at 252, 404 (duplicate record). At the time, Plaintiff was taking Flexeril, Vicodin, and Prozac, and the physician increased her Vicodin and Prozac doses following the appointment. Id.

On April 2, 2003, Dr. Phillips performed L4-L5, L5-S1 bilateral intra-articular facet joint injections. Id. at 247-48. Plaintiff reported one day of complete pain relief from these injections, but stated that the pain returned shortly thereafter. Id. at 241. Dr. Phillips then tried bilateral diagnostic sacroiliac joint injections. Id. at 241-42.

On July 7, 2003, Richard Heidenfelder, M.D., a board eligible psychiatrist, performed a complete psychiatric evaluation and concluded that Plaintiff was not impaired in any work-related way, except that she is "moderately impaired in her ability to respond to change in the normal workplace setting." Id. at 177-81. Dr. Heidenfelder opined that Plaintiff's psychiatric prognosis could be expected to improve in the next twelve months with active treatment. Id. at 181.

On July 22, 2003, Thomas Sabourin, M.D., a board certified diplomate of the American Board of Orthopaedic Surgeons, performed an orthopaedic consultation on Plaintiff and found that Plaintiff had no restrictions. Id. at 182-86. He explained that:

> This patient presents with pain syndrome, the severity and duration of which are disproportionate to the physical findings on orthopedic examination.
>
> From the functional orthopedic point of view, this patient has very little in the way of findings other than decreased range of motion in forward flexion. She has such pain throughout the examination as she hyperventilates and when the exam was done, she started crying.

Id. at 185-86.

On August 1, 2003, Plaintiff had an appointment with Dr. Jaffe, who noted that Plaintiff has suffered chronic, daily low back pain (LBP) since 2001, had facet injections/SI injections that did not help, and had a discogram that did not provide a good reproduction of her pain. Id. at 238. His notes further indicate that he observed "18/18 of FMS" (which seems to indicate 18/18 trigger points of fibromyalgia) and diagnosed fibromyalgia (among other things). Id. Dr. Jaffe also signed off on Plaintiff's application for disabled license plates, indicating on the form that Plaintiff had "severe fibromyalgia." Id. at 202.

Plaintiff underwent an additional MRI scan of her lumbar spine on August 6, 2003, for comparison to the May 15, 2002 study. Id. at 203-06, 525-26. The findings were similar to the previous scan, with "evidence for severe degenerative disk disease at the L5/S1 disk, and the presence of a small disk protrusion posteriorly and slightly off midline to the left with some encroachment into the left neural foramina noted." Id. at 526.

Drs. Jaffe and Phillips referred Plaintiff to Sanjay Khurana, M.D., for an orthopedic consultation and "evaluation of Plaintiff's persistent low back pain and bilateral leg pain in the setting of a diffuse fibromyalgia-type syndrome." Id. at 230. On September 15, 2003, Dr. Khurana examined Plaintiff and noted that she had somewhat limited mobility with pain generated when she forward flexes. Id. at 231. He recommended purely conservative treatment because, given her young age, surgical options were neither available nor advisable. Id. at 231-32. He suggested weaning off the narcotics she had been taking, while taking anti-inflammatories instead, and engaging in "any activity that she would like to do including aerobics, weights, swimming, or any activity she desires." Id.

On November 20, 2003, Richard Hicks, M.D., a board certified psychiatrist, conducted a comprehensive psychiatric evaluation of Plaintiff. Id. at 278-83. At that point, Plaintiff reported suffering anxiety attacks, depression, insomnia, problems with concentration, fibromyalgia, and disc pain. Id. at 278. She was taking Prozac for depression; Sulindac, Flexeril, and Vicodin (8 per day) for pain; and Tranxene for panic attacks. Id. Dr. Hicks diagnosed a depressive disorder as part of her overall physical picture and opined that she could do simple, repetitive tasks and could take instruction from supervisors. Id. at 282. He felt that "[h]er interaction with coworkers and the public would be very limited because of her preoccupation with her physical condition and her pain. Her consistency and regularity would be questionable because of her pain." Id.

On April 4, 2004, Plaintiff was admitted to the County of San Diego's Isis Center and reported being suicidal. Id. at 318-24. She said that she had stopped seeing a therapist in 2003 because her insurance ran out and had stopped taking Prozac because she did not think it helped her. Id. at 319. Plaintiff was diagnosed with major depressive disorder and referred for individual therapy and medication management. Id. at 322-23. After being discharged from Isis, Plaintiff

went for a follow-up appointment at South Bay Guidance on June 2, 2004.  Id. at 331-38.
Following an evaluation, Donna Mills, M.D. observed that Plaintiff was positive for daytime
somnolence, low motivation, and low energy, had a panic episode three days prior, and had poor
concentration.  Id. at 331, 335.  Dr. Milla prescribed Neurontin and Paxil CR.  Id. at 338.

Doctors Janna Ropohl, MD. (attending) and Marianne McKennett, M.D. (supervising) at the
Chula Vista Family Clinic evaluated Plaintiff on August 24, 2004.  Id. at 341-43.  Plaintiff
complained of back pain, but stated that she had not taken any medications since January.  Id.
at 341.  Upon physical examination, the physicians noted tenderness to palpation in the lumbar
and thoracic spine, restricted range of motion in the thoracic spine, and less than 60° of flexion
on a left Straight Leg Raising Test, but otherwise reported normal findings.  Id. at 342.  They
prescribed naprosyn and Soma for back pain and referred Plaintiff for water exercise and physical
therapy.  Id. at 343.

Finally, in a mental impairment questionnaire dated October 27, 2004, Dr. Mills explained
that in addition to monthly doctor visits, Plaintiff attended weekly group therapy meetings and
weekly individual coaching.  Id. at 533.  On a checklist form, Dr. Mills indicated positive mental
status findings for: anhedonia or pervasive loss of interest, decreased energy, thoughts of suicide,
feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty
concentrating, psychomotor agitation or retardation, paranoid thinking or inappropriate
suspiciousness, emotional withdrawal or isolation, disorientation to time and place, inflated self-
esteem, easy distractibility, sleep disturbance, recurrent severe panic attacks, and a history of
multiple physical symptoms for which there ware no organic findings.  Id. at 19, 534.  When
asked to "[d]escribe the *clinical findings* including results of mental status examination that
demonstrate the severity of your patient's mental impairment and symptoms," Dr. Mills wrote
"[t]his client presented with severe depressed & anxious mood, insomnia, low energy, panic
attacks, chronic physical pain, thoughts of suicide and interpersonal relationship problems."  Id.
Dr. Mills then wrote in her diagnosis of "major depressive disorder, recurrent severe without
psychotic features" and noted that Plaintiff was not responding to Paxil and was starting
Wellbutrin and that Dr. Mills felt Plaintiff's prognosis was poor.  Id. at 533-38.  In a checkbox-type

1  chart eliciting an evaluation of Plaintiff's functional limitations, Dr. Mills indicated that Plaintiff had

2  "extreme" limitations in each of the following three areas: (a) restriction of activities of daily

3  living, (b) difficulties in maintaining social functioning, and (c) difficulties in maintaining

4  concentration, persistence or pace.  Id. at 536.  She further noted that Plaintiff had suffered four

5  or more episodes of decompensation within a twelve-month period.  Id.

6  **III.  Social Security Administration Hearing**

7          During the November 17, 2004 hearing before the ALJ, Plaintiff, who was represented by

8  counsel, alleged a disability onset date of November 9, 2001.  Id. at 564.  However, upon learning

9  that Plaintiff went back to work part-time at the DMV for seven months, the ALJ amended

10 Plaintiff's disability onset date to April 1, 2003.  Id. at 565-67.

11         During questioning from her attorney, Plaintiff explained that she could not currently

12 perform any of her past jobs due to her back pain, general body pain, and anxiety.  Id. at 569.

13 She testified that she cannot sit or stand for more than a few minutes without extreme pain,

14 which comes in flares and spasms.  Id. at 570, 577.  She described her back pain as constant in

15 her lower back, though the degree of severity varies and sometimes radiates down her left leg

16 and up the middle of her back.  Id. at 574-75.  Plaintiff stated that her fibromyalgia causes

17 weakness and tenderness all over her body, with particular sensitivity in her shoulders, neck,

18 back, thighs, and calves.  Id. at 575-76.  Plaintiff also testified that her fear of being reprimanded

19 and resulting anxiety (in the form of shortness of breath, light-headedness, a rapid heart rate,

20 and feelings of tingliness and dizziness) prevented her from calling her employer to say that her

21 pain prevented her from working.[2]  Id. at 571.

22         As of the date of the hearing, Plaintiff claimed that she needed to rest for six hours in an

23 eight-hour day and was taking Paxil, Wellbutrin, Soma, and Naproxen.  Id. at 572.  However, she

24 stated that the medications she was taking did not help at all with her back pain.  Id.  She

25 explained that she used to take Sylindac and Flexoril, which provided some relief, but that she

26

27         [2] Plaintiff also explained that she suffers from sleep apnea, but had to stop using her CPAP machine when

28 her insurance ran out and she could not obtain a humidifier for it.  Id. at 576-77.

1   has not been able to get these medications since she lost her insurance.  Id. at 572-73.  Her

2   doctors have told her she was not a candidate for fusion surgery because it would cause the

3   degenerative disc disease to move up her spine and she would end up requiring multiple

4   surgeries.  Id. at 574-75.  The treatments doctors have tried—epidural shots, a discogram MRI,

5   and bilateral joint injections—have not helped.  Id. at 575.

6        In regard to her depression, Plaintiff testified that she was diagnosed in 2001 and just

7   started taking the combination of Paxil and Wellbutrin a few weeks prior to the hearing.  Id. at

8   579.  She still had panic attacks, had no energy, preferred to be alone, cried and felt pitiful, had

9   trouble concentrating, and still sometimes felt suicidal.  Id. at 580-81.  As a result of these issues

10  and her physical pain, Plaintiff spent most days sleeping or lying down, listening to music, or

11  watching television.  Id. at 582.  She only went out for appointments and errands.  Id.

12       Dr. Morse then testified about Plaintiff's physical ailments.[3]  Id. at 583.  He opined that

13  Plaintiff's degenerative disc disease at the L5-S1 level, with some dessication at the L5 disc space,

14  was severe, but did not meet or equal a Social Security disability listing.  Id. at 584-85.  It would,

15  however, limit Plaintiff to lifting only twenty-five pounds frequently or fifty pounds occasionally,

16  sitting or standing for six hours in an eight-hour workday, and only crouching occasionally.  Id.

17  at 585-86.  He did not believe the diagnosis of fibromyalgia had been established by the medical

18  evidence.  Id. at 584.  And, though Plaintiff's sleep apnea was medically established, he opined

19  that it should be non-severe with treatment.  Id.

20       On cross-examination by Plaintiff's attorney, Dr. Morse disagreed with the treating

21  physician that Plaintiff's MRI showed severe disc disease, instead relying on the opinion of a

22  consultative physician, who felt it was not severe because it did not show radiculopathy (which

23  causes motor weakness).  Id. at 587-88.  Dr. Morse felt that Plaintiff's objective findings did not

24  correlate with many of her subjective symptoms.  Id. at 591.

25

26  _____

27       [3]  The ALJ explained that he chose Dr. Morse, even though he is a cardiologist and Plaintiff has not alleged
    cardiac issues, because the administration could not hire experts for each of Plaintiff's diverse ailments and he
    considered Dr. Morse a generalist.  Id. at 551-52.  Plaintiff's attorney did not object to Dr. Morse offering testimony.

28  Id. at 553.

1    Dr. Haroun then testified about Plaintiff's alleged mental impairments.  Dr. Haroun did not

2    find that panic disorder had been established by the medical evidence, but did believe Plaintiff

3    suffered from a severe affective disorder (though not at a listing level).  Id. at 592-94, 596.

4    Though different physicians classified this affective disorder differently, he felt it was most

5    accurately described as a depressive disorder, NOS.  Id. at 594.  While he acknowledged that

6    Plaintiff surely had real physical pain, he opined that Plaintiff's mental impairment, standing alone,

7    would only limit her social functioning to a mild degree.  Id. at 595-96.  He felt that it would cause

8    mild impairment of her ability to do "super repetitive tasks," mild to moderate impairment of

9    concentration, etc., and moderate impairment of her ability to engage in complex tasks.  Id. at

10   596.  He noted no repeated episodes of decompensation.  Id.  Given all of this, he opined that

11   Plaintiff's residual functional capacity would be for "super repetitive tasks in a non-public setting."

12   Id.  During cross-examination, Dr. Haroun acknowledged that if all of the answers on the medical

13   impairment questionnaire completed by Plaintiff's treating physician, Dr. Mills, were accepted,

14   Plaintiff would meet a Social Security disability listing.  Id. at 598-99.

15   Finally, the ALJ heard testimony from the VE.  The ALJ asked the VE if Plaintiff could

16   perform any of her past relevant work if he were to find that Plaintiff retained a residual functional

17   capacity limited to a range of medium work with the additional non-exertional limitations that

18   Plaintiff could only occasionally climb, balance, stoop, crouch or crawl, and was limited mentally

19   to non-public simple, repetitive tasks.  Id. at 601-02.  The VE opined that she could not because

20   Plaintiff's mental limitations alone precluded her from performing any of her past work.  Id. at

21   602.  The VE explained that the hypothetical limitations would put Plaintiff at vocational guideline

22   203.29 (younger individual, high school graduate or more, no direct entry into work, skilled or

23   semi-skilled, skills not transferrable) with her non-exertional (mental) limitations causing "severe

24   erosion" of the occupational list.  Id. at 603-04.  Nonetheless, the VE listed sweeper/cleaner,

25   textile stuffer, and bench hand as three jobs Plaintiff could perform.  Id. at 604-05.  However,

26   when Plaintiff's attorney asked if the person in the hypothetical with the additional limitations that

27   Plaintiff testified to could work full-time, the VE answered "no."  Id. at 605.

28   ///

**STANDARD OF REVIEW**

Section 405(g) of the Social Security Act permits unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error.  Id.; Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001) (citation omitted).  It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." Id. (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003).  Where the evidence reasonably can be construed to support more than one rational interpretation, the court must uphold the ALJ's decision.  Batson, 350 F.3d at 1193.  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts. See Lewis, 236 F.3d at 509.

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision.  See Batson, 359 F.3d at 1193.  Section 405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the matter to the Social Security Administration for further proceedings.  Id.

**DISCUSSION**

Plaintiff seeks a default judgment based on Defendant's failure of consideration in connection with the 2007 remand (i.e. in letting the case linger for three years).  Pl.'s Brief and Mot. for Summ. J. (Pl.'s Brief) at 2, 23.  Alternatively, Plaintiff asks the Court to conduct a *de novo* review of the entirety of the case records, including new evidence presented by Plaintiff.  Id. Plaintiff believes this review should lead to reversal of the ALJ's decision and an award of benefits. Id. at 23-24.  Defendant argues the ALJ's decision is based on substantial evidence and free of legal error.  Def.'s Mem. at 12-23.

## I.   Plaintiff is Not Entitled to a Default Judgment

Plaintiff seeks a default judgment against Defendant based on Defendant's failure of consideration regarding the joint motion to remand that the parties filed in 2007.  Pl.'s Brief at 2-6.  Plaintiff explains that the she agreed to the joint motion because Defendant could not locate the record from Plaintiff's administrative hearing and Defendant told her that, if the record could not be located within a reasonable amount of time, the Commissioner would remand the case to an ALJ for a *de novo* hearing.  Id. at 2-3.  Ultimately, it took Defendant three years to locate the record and reopen the case in federal court—a time period Plaintiff believes is unreasonable.  Id. at 3, 5.

Though Defendant's delay was lengthy and has never been explained, a default judgment is not available as a remedy.  Rule 55 of the Federal Rules of Civil Procedure provides that the clerk of court may enter a default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  Fed. R. Civ. P. 55(a).  That is not the case here.  The parties filed the joint motion to remand on the date Defendant's answer to Plaintiff's complaint was due.  See ECF Nos. 13 & 14.  Once the case was reopened, Defendant filed a timely answer to Plaintiff's complaint.  See ECF Nos. 19 & 21.  Since that time, Defendant has filed timely briefs and responses and otherwise defended against Plaintiff's case.  Furthermore, Plaintiff has never asked the clerk to enter a default, which is the precursor step to seeking a default judgment from the Court.  Fed. R. Civ. P. 55(a)-(b).  For these reasons, the Court finds that a default judgment is not appropriate in this case.[4]  See Cmty. Dental Serv. v. Tani, 282 F.3d 1164, 1170 (9th Cir. 2002) (quoting Falk v. Allen, 739 F.2d 461, 463 (9th Cir. 1984) (per curiam)) (judgment by default is an extreme measure and a case should, 'whenever possible, be decided on the merits'").  The Court, therefore, **RECOMMENDS** that Plaintiff's request for a default judgment be **DENIED**.

*///*

---

[4]  Rule 37(b)(2)(A)(vi) also mentions the remedy of a default judgment, but this provision is not applicable to the circumstances at bar because Rule 37 provides remedies for discovery violations.

## II.     The Court Cannot Consider New Evidence or Conduct a *De Novo* Review

Plaintiff asks that the Court conduct a *de novo* review of the administrative record in her case as well as the new evidence she submitted to the Court.  Pl.'s Brief at 2.  As this Court explained in its April 21, 2011 order, the role of the district court is wholly appellate in social security cases.  ECF No. 47; 42 U.S.C. § 405(g) ("[t]he court shall have power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security).  The district court may not consider new evidence in reviewing the decision of the Commissioner of Social Security.  <u>See</u> 42 U.S.C. § 405(g) (explaining that the court may consider only "the pleadings and transcript of the record"); <u>see also</u> <u>Ellis v. Bowen</u>, 820 F.2d 682, 684 (5th Cir. 1987) (expressly confirming that "[t]he courts may not take new evidence"); Carolyn A. Kubitschek & Jon C. Dubin, <u>Social Security Disability Law and Procedure in Federal Court</u> § 9.57 (West, 2011 ed.) ("the District Court may not consider evidence outside of the administrative record in reviewing a claim for benefits").  For the same reasons, the Court also lacks jurisdiction to conduct a *de novo* review.  <u>See</u> <u>e.g.</u> 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...").  The Court, therefore, **DENIES** Plaintiff's requests for a *de novo* hearing and consideration of new evidence.

## III.    The ALJ's Decision

Pursuant to Social Security Regulations, the ALJ followed a five-step sequential evaluation process for determining whether Plaintiff was disabled.  AR at 15-24; <u>see also</u> 20 C.F.R. § 416.920(a) (describing five-step assessment).

### A.     Step One

At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date of disability of April 1, 2003.  AR at 23; <u>see also</u> 20 C.F.R. § 416.920(a)(I).  Plaintiff asserts that the correct disability onset date is November 9, 2001.  Pl.'s Brief at 7-8.  Plaintiff explains that she did not work from November 10, 2001 to September 2002 and then she only worked part-time and sporadically from September 2002 to April 1, 2003.  <u>Id.</u>; AR at  564-67.  Given the irregular  and part-time nature of her work, Plaintiff believes this

1  second period should qualify as an "unsuccessful work attempt."  Pl.'s Brief at 7-8.  If so
2  classified, the correct alleged disability onset date would be November 9, 2011.  Id.
3       "Work activity is 'substantial' if it 'involves doing significant physical or mental activities.'"
4  Corrao v. Shalala, 20 F.3d 943, 946 (9th Cir. 1994) (quoting 20 C.F.R. § 416.972(a)).  Under this
5  definition, part-time work may be "substantial." 20 CFR § 404.1572(a) ("work may be substantial
6  even if it is done on a part-time basis"); Keyes v. Sullivan, 894 F.2d 1053, 1056 (9th Cir. 1990).
7  The primary criterion for determining whether a claimaint's work is substantial gainful activity is
8  the amount of the claimant's earnings.  See 20 CFR § 404.1574(a)-(b).  If the claimant averaged
9  $700 or more per month in the year 2000, or more than the average monthly salary minimum for
10 each year thereafter (as adjusted based on the national average wage index), the presumption
11 is that the claimant engaged in substantial gainful activity.  20 CFR § 404.1574(b)(2)-(3); Keyes,
12 894 F.2d at 1056.  This presumption is rebuttable, with the factors to be considered including "the
13 time spent working, quality of a person's performance, special working conditions, and the
14 possibility of self-employment."  Katz v. Sec'y of Health & Human Serv., 972 F.2d 290, 293 (9th
15 Cir. 1992).
16      However, "substantial gainful activity means more than merely the ability to find a job and
17 physically perform it; it also requires the ability to hold the job for a significant period of time."
18 Gatliff v. Comm'r of Soc. Sec. Admin., 172 F.3d 690, 694 (9th Cir. 1999).  If an individual stops
19 working for a significant period of time due to his or her disability and then resumes working, only
20 to stop again, this may be considered an unsuccessful work attempt.  See 20 CFR § 404.1574(c).
21 An unsuccessful work attempt does not affect the disability onset date.  Id.  Generally, if an
22 individual works less than three months, it constitutes an unsuccessful work attempt.  20 CFR
23 § 404.1574(c)(3).  More than six consecutive months of work, on the other hand, cannot be
24 considered an unsuccessful work attempt.  20 CFR § 404.1574(c)(5).  If an individual worked
25 between three and six months, the Social Security Administration (SSA) applies the following rule:
26      We will consider work that lasted longer than 3 months to be an unsuccessful work
        attempt if it ended, or was reduced below substantial gainful activity earnings level,
27      within 6 months because of your impairment or because of the removal of special
        conditions which took into account your impairment and permitted you to work and-
28

14                                    06cv82-WQH (BLM)

1    (i) You were frequently absent from work because of your impairment;

2    (ii) Your work was unsatisfactory because of your impairment;

3    (iii) You worked during a period of temporary remission of your impairment; or

4    (iv) You worked under special conditions that were essential to your performance
     and these conditions were removed.

5

6  20 CFR § 404.1574(c)(4).

7         In this case, Plaintiff did not work from November 10, 2001 to September 2002, and then

8  returned to work part-time from September 2002 to April 1, 2003.  AR at  564-67.  For the period

9  from September 2002 through March 30, 2003, the ALJ looked to Plaintiff's earning records to see

10 if this work qualified as substantial gainful activity or an unsuccessful work attempt.  See AR at

11 15.  In calendar year 2002, Plaintiff earned $7,071.30 and in calendar year 2003, her earnings

12 were $3,469.01.  Id. at 15, 98, 104.  The ALJ concluded that because the monthly average of

13 these amounts fell above the minimums set forth in the regulations, Plaintiff was presumed to

14 have been engaged in substantial gainful activity for this seven-month period.  Id. at 15, 564-67.

15 Plaintiff's administrative counsel attempted to rebut this by arguing that Plaintiff's earnings fell

16 below the minimum for some months, pointing to the Work Activity Report completed by an SSA

17 representative (Ex. 6E), which listed monthly totals for the period in question.  Id. at 566-67

18 (referencing AR at 142).  However, the ALJ rejected this argument because he did not know

19 where the figures in Exhibit 6E came from, whereas the detailed earnings report listing her annual

20 earnings came directly from the employers.  Id. at 567.  In her summary judgment motion,

21 Plaintiff points only to new evidence, which this Court cannot consider, to support her argument

22 that her work constituted an unsuccessful work attempt.  Pl.'s Brief at 8.

23        Having reviewed the evidence and argument before it, the Court finds no basis for

24 disturbing the ALJ's decision.  According to SSA regulations, Plaintiff's monthly earnings may be

25 calculated by "averag[ing] [her] earnings separately for each period in which a different

26 substantial gainful activity earnings level applies."  20 CFR § 404.1574a(b).  The SSA's guidelines

27 list the Substantial Gainful Activity (SGA) minimum for 2002 as $780 and the SGA minimum for

28 2003 as $800.  See SSA's Program Operations Manual System D1 10501.015, Table of SGA

Earnings Guidelines and Effective Dates Based on Years of Work Activity (2010), *available at* http://policy.ssa.gov/poms.nsf/lnx/0410501015.  The monthly average of Plaintiff's 2002 salary is $1,767.83, which is well above the $780 minimum, and her monthly average for 2003 of $1,156.34 is over the $800 minimum.  Thus, the ALJ did not err in concluding that Plaintiff earned over the minimum for seven consecutive months.  Likewise, because Plaintiff worked more than six consecutive months, her work could not be considered an unsuccessful work attempt.  See 20 CFR § 404.1574(c)(5).  Given that this Court also cannot ascertain the source of the figures in Exhibit 6E and that the Court has no other rebuttal evidence or arguments before it, the Court finds that the ALJ's decision that Plaintiff engaged in substantial gainful activity from September 2002 through March 30, 2003 is supported by substantial evidence and not based on legal error.  In light of this conclusion, the Court further finds that the ALJ properly concluded that Plaintiff could not be found disabled for the period from November 10, 2001 to September 2002 because this period did not meet the SSA's twelve-month durational requirement.  See 20 CFR § 404.1509.

**B.   Step Two**

At step two, the ALJ must determine whether the claimant has "a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement."  20 CFR § 404.1520(a)(4)(ii).  An impairment or combination of impairments is considered severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 CFR § 404.1520(c).  As explained by the Ninth Circuit, this test is not intended to impose a high bar on claimants:

> An impairment or combination of impairments may be found "not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Smolen* [v. Chater], 80 F.3d [1273,] [] 1290 [9th Cir. 1996] (internal quotation marks omitted) (emphasis added); *see Yuckert v. Bowen,* 841 F.2d 303, 306 (9th Cir.1988). The Commissioner has stated that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." S.S.R. No. 85-28 (1985). Step two, then, is "a de minimis screening device [used] to dispose of groundless claims," *Smolen,* 80 F.3d at 1290, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly established by medical evidence." S.S.R. 85-28. Thus, applying our normal standard of review to the requirements of step two, we

1   must determine whether the ALJ had substantial evidence to find that the medical
2   evidence clearly established that Webb did not have a medically severe impairment
    or combination of impairments. *See also Yuckert,* 841 F.2d at 306 ("Despite the
3   deference usually accorded to the Secretary's application of regulations, numerous
    appellate courts have imposed a narrow construction upon the severity regulation
    applied here.").

4

5   Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005); see also Gardner v. Astrue, 257 Fed.

6   Appx. 28, 29 (9th Cir. 2007) (finding enough evidence of ankle impairment to "clear the low bar

7   at step two" and ordering the ALJ on remand to consider the impairment severe and incorporate

8   any limitations it caused into the claimant's residual functional capacity assessment before

9   conducting the step-five determination).  That being said, "[i]mpairments that can be controlled

10  effectively with medication are not disabling for the purpose of determining eligibility for SSI

11  benefits." Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006); but see

12  Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995) ("a disabled claimant cannot be denied

13  benefits for failing to obtain medical treatment that would ameliorate his condition if he cannot

14  afford that treatment").

15      The ALJ determined at the second step that Plaintiff had the following "severe"

16  combination of impairments: lumbar degenerative disc disease and a depressive disorder, NOS.

17  AR at 23; see also 20 C.F.R. § 416.920(a)(4)(ii).  Plaintiff argues that the ALJ's findings at step

18  two are incomplete because the ALJ also should have included fibromyalgia, anxiety disorder with

19  panic attacks, and sleep apnea in his findings.  Pl.'s Brief at 8.

20      As Defendant points out, the ALJ found that Plaintiff had severe mental and physical

21  impairments, so technically Plaintiff prevailed at step two.  See Def.'s Mem. at 15.  This is true

22  because when an ALJ determines a claimant's residual functional capacity (RFC) at step four, the

23  ALJ must consider the effects of *all* of the claimant's impairments (including pain), not just those

24  which were determined to be severe at step two.  See 20 CFR § 404.1545(e); Rhoades v.

25  Barnhart, 64 Fed.Appx. 76, 77 (9th Cir. 2003) ("[i]n determining a claimant's RFC, the ALJ must

26  consider the limiting effects of all of the claimant's impairments, even those that were not

27  severe"); see also Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (quoting Soc.

28  Sec. Ruling 96-8p, 1996 WL 374184, at *5 (July 2, 1996)) ("[i]n determining a claimant's RFC,

1  an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay

2  evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a

3  medically determinable impairment'").   Thus, at step four, the ALJ was required to consider

4  evidence of any limiting effects attributable to Plaintiff's fibromyalgia, anxiety disorder with panic

5  attacks, and sleep apnea, even if he did not find these conditions to be severe at step two.

6  Nonetheless, the Court will consider Plaintiff's objections to the ALJ's findings at this step.

7         With regard to fibromyalgia, Plaintiff objects that the ALJ overlooked evidence and failed

8  to consider the realities of her medical treatment.   The ALJ made the following statements

9  pertaining to Plaintiff's fibromyalgia,:

10    Progress notes through November 3, 2003, document complaints of persistent low
      back pain and bilateral leg pain.  A diagnosis of diffuse fibromyalgia-type syndrome

11    was also reported.  However, progress notes do not set forth an examination which
      meets the criteria for a diagnosis of fibromyalgia.   In particular, there is no

12    documentation of symptoms associated with trigger points, and the claimant has
      not been referred to a rheumatologist or other specialist familiar with diagnosis

13    fibromyalgia.   She was treated conservatively with Vicodin, physical therapy,
      epidural injections, facet blocks, and bilateral sacroiliac blocks.

14

15                                                          …

16    On a DMV Application for Disabled Person Placard or Plates form completed on
      August 1, 2003, Michael Jaffe, D.O. certified that the claimant was disabled due to

17    severe fibromyalgia.  No specific objective findings were reported.

18  AR at 16-17.   Plaintiff rebuts the ALJ's findings by pointing to medical evidence in the

19  administrative record that show she was diagnosed as having 16 of 18 tender points and

20  fibromyalgia.  Pl.'s Brief at 9 (citing AR at 252).  Additionally, Plaintiff points out that both when

21  she was insured and seeing physicians within the framework of Kaiser's HMO and when she

22  became uninsured and was relying on County Medical Services, she was at the mercy of the

23  procedures of these organizations, which generally do not allow patients to see specialists before

24  meeting with a primary physician, having numerous tests, and trying several treatment

25  alternatives.  Id. at 11.  She explains that she was midway through this process at Kaiser when

26  her insurance ran out, so she had to start all over at County Medical Services.  Id.  In August of

27  2004, she was being treated at the Chula Vista Family Clinic, where the physician notes indicate

28  she had a history of fibromyalgia, and that the doctor referred her for a physical therapy

1   evaluation and also provided the number for a local aquatic club so Plaintiff could do pool

2   exercises.  AR at 343.  The notes further indicate that Plaintiff requested a referral for

3   rheumatology, but that they "will try to focus on other 2 referals (sic) before this one" (apparently

4   referencing the physical therapy and aquatic club referrals).  Id.

5        While the record is replete with evidence that Plaintiff experienced prolonged periods of

6   pain in her back and legs, which interfered with her ability to work, it is not clear from the record

7   that this pain was directly attributable to fibromyalgia as opposed to Plaintiff's disc issues.

8   Because any impact the fibromyalgia had on Plaintiff's ability to work, that was separate and apart

9   from the impact of the disc disease, bears more directly on the ALJ's analysis at Step Four, the

10  Court will discuss this issue more thoroughly in it's section addressing the ALJ's Step Four

11  determination.

12       With regard to Plaintiff's claimed diagnosis of anxiety disorder with panic attacks, Plaintiff

13  does not cite to evidence in the record where a physician made this diagnosis.  The testifying

14  psychiatrist, Dr. Haroun, noted that Dr. Heidenfelder diagnosed "panic disorder without

15  agoraphobia" following his consultative examination, see AR at 180, 593, but Dr. Haroun did not

16  find that this diagnosis was sufficiently established in the record and it is unclear whether this is

17  even the diagnosis to which Plaintiff refers.  Furthermore, Dr. Heidenfelder opined that Plaintiff

18  would be moderately impaired in her ability to respond to change in the normal workplace setting,

19  but otherwise concluded that all other work-related functions would be unimpaired.  Id. at 181.

20  Thus, even if Plaintiff was diagnosed with a panic disorder, there is no evidence in the record that

21  it "significantly limits [her] physical or mental ability to do basic work activities."  20 CFR

22  § 404.1520(c).  In other words, it fails to meet the Step Two severity threshold.  The ALJ,

23  therefore, did not err in failing to include this diagnosis in his list of Plaintiff's severe impairments.

24       Finally, the Court finds that Plaintiff has not presented evidence that her sleep apnea

25  qualifies as severe.  As previously noted, the Social Security Administration does not consider

26  impairments that can be controlled effectively with medication to be disabling.  Warre, 439 F.3d

27  at 1006.  Plaintiff repeatedly has told her treating physicians that she sleeps better when she uses

28  it and feels less tired during the day.  AR at 268, 426.  However, she has discontinued using it,

at least periodically, because it bothers her boyfriend.  Id. at 134, 268.  An impairment cannot be considered severe where effective treatment exists and the claimant simply chooses not to utilize it.

Plaintiff could attempt to point to her hearing testimony in support of the argument that she could not afford effective treatment.  As previously noted, disability benefits cannot be denied because a claimant did not obtain effective treatment if the claimant cannot afford the treatment. Gamble, 68 F.3d at 321.  Plaintiff claimed during the hearing that she discontinued using the CPAP machine because it dried out her throat and she could not afford the prescription humidifier necessary to make it tolerable after her insurance expired.  AR at 576-77.  However, it was the ALJ's responsibility to decide which of Plaintiff's stories he believed — that she discontinued treatment due to her boyfriend's displeasure with the machine or due to the inability to make the machine more comfortable through use of a humidifier.  The law is clear that this Court must defer to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  See Lewis, 236 F.3d at 509.  Therefore, the Court finds that ALJ's decision to exclude sleep apnea as a severe impairment was supported by substantial evidence.

Accordingly, the Court finds that the ALJ did not err in making his determination at step two that Plaintiff had the requisite severe combinations of impairments – lumbar degenerative disc disease and a depressive disorder, NOS.

### C.   Step Three

At the third step, the ALJ found that Plaintiff's impairments did not meet or medically equal a listed impairment under Social Security Regulations.   AR at 23; see also 20 C.F.R. § 416.920(a)(4)(iii).  Listed impairments are those presumed to be disabling.  See 20 C.F.R. § 404.1525.  If any individual's impairment meets a listing, the administration will find the individual disabled without even considering the individual's age, education, or work experience. 20 CFR § 404.1520(a)(4)(iii), (d).  A claimant may also meet a listing if his or her impairment equals a listed impairment (20 C.F.R. § 404.1520(d)) or if the claimant's combination of impairments is medically equal to a listed impairment (20 C.F.R. § 404.1526(a)-(b)).

Plaintiff contends that her degenerative disc disease, fibromyalgia, depression, and anxiety

1  disorder with panic attacks all meet or equal a listing. Pl.'s Brief at 13-14. For each disorder, she

2  cites the listing she believes it meets or equals. Id. However, Plaintiff points to no medical

3  evidence in the record supporting her assertions and makes no arguments as to why the ALJ's

4  conclusion that she did not meet a listing was in error. The Supreme Court has made clear that

5  the burden of showing a medically determinable impairment and providing medical and other

6  evidence in support thereof falls on the claimant. Bowen v. Yuckert, 482 U.S. 137, 146 and n.5

7  (1987); Roberts v. Astrue, 2011 WL 3501863, at *2 (C.D. Cal. Aug. 9, 2011) ("[t]he claimant

8  bears the burden of demonstrating that her impairments are equivalent to a listed impairment

9  that the Commissioner acknowledges are so severe as to preclude substantial gainful activity");

10  see also Lewis, 236 F.3d at 514 (rejecting claimant's argument that his disorders met or equaled

11  a listing where claimant "offered no theory, plausible or otherwise, as to how his seizure disorder

12  and mental retardation combined to equal a listed impairment" and pointed to no evidence

13  showing that his combined impairments equaled a listing). As Plaintiff has failed to offer any

14  evidence to the contrary, there is no basis for this Court to disturb the ALJ's decision at step

15  three.        **D.    Step Four**

16  At the fourth step of the disability assessment, the ALJ determined that Plaintiff possessed

17  the "residual functional capacity" (RFC) to "perform a significant range of medium work." AR at

18  21. More specifically, the ALJ found that Plaintiff retained the RFC to "lift and/or carry up to 25

19  pounds frequently or 50 pounds occasionally; to sit, stand, or walk about six hours each in an

20  eight-hour day; and to occasionally climb, balance, stoop, kneel, crouch, or crawl. She is further

21  limited to simple repetitive tasks in a non-public setting." Id. at 20, 23; 20 C.F.R.

22  § 416.920(a)(4)(iv). Given these limitations, the ALJ concluded that Plaintiff could not perform

23  any of her past relevant work. AR at 23; 20 C.F.R. §§ 404.1565 & 416.965.

24  In evaluating Plaintiff's physical limitations, the ALJ considered medical records and

25  opinions from Plaintiff's treating physicians, Dr. Jaffe, Dr. Quan, and Dr. McKennett; consultative

26  examiners, Dr. Phillips, Dr. Sabourin, and Dr. Khurana; and the medical expert who testified at

27  the hearing, Dr. Morse. AR at 16-8. As the ALJ pointed out, none of Plaintiff's treating physicians

28  provided a specific assessment of her physical functional limitations. Id. at 18. In evaluating

1   Plaintiff's mental limitations, the ALJ considered medical records and opinions from Plaintiff's

2   treating physicians at County of San Diego Mental Health Services and the South Bay Guidance

3   Center (in particular that of Donna Mills, M.D.); consultative psychiatrists, Dr. Heidenfelder and

4   Dr. Hicks; and the psychiatric medical expert who testified at the hearing, Dr. Haroun.  Id. at 19-

5   20.  Dr. Mills[5] did provide an assessment of Plaintiff's mental limitations and how they impacted

6   her ability to work.  See id. at 19, 533-38.

7         Plaintiff challenges the ALJ's assessment of her RFC generally on the grounds that it is

8   contradicted by her treating physicians and represents nothing more than a full adoption of the

9   consultative examiner's "checklist," which is not based on objective findings.  See Pl.'s Brief at 21.

10  Plaintiff also objects to the ALJ's bases for discounting her own testimony regarding her pain and

11  limitations.  Id. at 14-21.  Because the ALJ's discounting of both the treating physician's opinions

12  and Plaintiff's credibility impacts this Court's determination of whether his RFC decision is based

13  on substantial evidence, this Court addresses each issue below.

14              **1.    Plaintiff's Treating Physicians**

15        The opinion of a treating physician generally should be given more weight than opinions

16  of doctors who do not treat the claimant.  See Turner v. Comm'r. of Soc. Sec., 613 F. 3d 1217,

17  1222 (9th Cir. 2010) (citing Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995)).  If the treating

18  physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and

19  convincing" reasons supported by substantial evidence in the record.  Id. (citing Lester, 81 F.3d

20  at 830-31).  Even when the treating doctor's opinion is contradicted by the opinion of another

21  doctor, the ALJ may properly reject the treating physician's opinion only by providing "specific and

22  legitimate reasons" supported by substantial evidence in the record for doing so.  Id. (citing

23  Lester, 81 F.3d at 830-31).  This can be done by "setting out a detailed and thorough summary

24  of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making

25  findings."  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes v.

26  Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  "The ALJ must do more than offer his conclusions.

27  _____

28         [5]  The ALJ mistakenly refers to Dr. Mills as "Dr. Miller" in his decision.

1    He must set forth his own interpretations and explain why they, rather than the doctors', are

2    correct." <u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007) (quoting <u>Embrey v. Bowen</u>, 849 F.2d

3    418, 421-22 (9th Cir. 1988)).

4       In reviewing the ALJ's decision, it is apparent that the only treating physicians' opinions

5    that the ALJ expressly discounted were those of Dr. Jaffe and Dr. Mills.  <u>See</u> AR at 16-20.

6    Because these treating physicians' opinions were contradicted by those of other examining

7    physicians, the ALJ was required to provide specific and legitimate reasons, supported by

8    substantial evidence, for rejecting them.  <u>See</u> <u>Turner</u>, 613 F.3d at 1222, <u>and</u> 20 CFR §

9    404.1527(d)(1) (2010).

10       As previously noted, the ALJ discounted Dr. Jaffe's fibromyalgia diagnosis because his

11    medical records did not document symptoms associated with trigger points, Plaintiff was not

12    referred to a rheumatologist or other specialist familiar with diagnosing fibromyalgia, Plaintiff was

13    treated conservatively, and Dr. Jaffe did not report objective findings on the DMV form he

14    completed in order for Plaintiff to obtain a disabled placard. AR at 16-17. Preliminarily, Dr. Jaffe's

15    conclusion on the DMV form that Plaintiff was disabled due to "severe fibromyalgia," <u>see</u> AR at

16    202, was not a medical opinion at all, but an administrative finding reserved to the Commissioner.

17    20 CFR § 404.1527(e)(1).  It is for the ALJ to decide the ultimate issue of whether the claimant

18    is or is not disabled.  <u>Id.</u>  Accordingly, the Court finds the ALJ properly discounted Dr. Jaffe's

19    conclusion as set forth on the DMV form.  However, the record does not support the ALJ's

20    conclusions regarding lack of evidence of trigger points and objective findings. As Plaintiff points

21    out, the administrative record shows that on January 24, 2003, a treating physician[6] observed that

22    Plaintiff had 16 of 18 tender points and diagnosed fibromyalgia. Pl.'s Brief at 9 (citing AR at 252).

23    Dr. Jaffe's August 1, 2003 notes indicate that he observed "18/18 of FMS" (which seems to

24    indicate 18/18 trigger points of fibromyalgia) and he specifically diagnosed fibromyalgia (among

25    other things).  AR at 238.  In this same record, Dr. Jaffe notes that Plaintiff has suffered chronic,

26

27

28

[6] The signature on the medical record is unclear, though Plaintiff states that it was Bill H. McCarberg, M.D., FABPM, a "Diplomate [of the] Americal Academy of Pain Medicine." Pl.'s Brief at 9.

daily low back pain (LBP) since 2001, saw Dr. McCarberg, had facet injections/SI injections that did not help, and had a discogram that did not provide a good reproduction of her pain. Id. Dr. Jaffe signed off on the DMV form the same day. AR at 202. Thus, there is evidence from treating physicians and sources in the record demonstrating clinical findings and trigger point analysis supporting a fibromyalgia diagnosis.

However, the critical issue at this step is *not* whether Plaintiff has fibromyalgia but whether the diagnosed firbromyalgia restricts Plaintiff's ability to work. Plaintiff has not identified (and the Court has not located) any evidence in the record indicating a specific restriction on Plaintiff's ability to work caused by the fibromyalgia. As such, Plaintiff fails to show that the ALJ's *RFC determination* is not based on substantial evidence. While it is true that an ALJ may only reject a controverted opinion by a treating doctor by providing specific and legitimate reasons, supported by substantial evidence, for doing so, see Turner, 613 F.3d at 1222 and 20 CFR § 404.1527(d)(1) (2010), an ALJ may properly reject a treating physician's opinion where the physician's determination is "conclusory and unsubstantiated by relevant medical documentation," Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

In Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004), the Ninth Circuit acknowledged that fibromyalgia is an elusive disease, which effectively evades objective measurement, but nonetheless based its decision that the ALJ failed to provide legally sufficient reasons for rejecting Benecke's treating physicians' opinions on an overwhelming amount of record evidence. The claimant in Benecke consistently reported pain throughout her body, was diagnosed with fibromyalgia by three rheumatologists and a pain management specialist, participated in a fibromyalgia support group, and presented the ALJ with four RFC assessments from treating rheumatologists, all of which concluded that Plaintiff could not sustain full-time work. Benecke, 379 F.3d at 590-91. A specialist in internal medicine who conducted a consultative examination of Plaintiff also diagnosed fibromyalgia. Id. at 592. In light of this record, the Ninth Circuit agreed with the district court that the ALJ failed to provide legally sufficient reasons for rejecting Benecke's treating physicians' opinions that Plaintiff did not retain the RFC for full-time work. Id. at 593-94.

The generally inconclusive medical record presented in this case differs markedly from the clear facts of <u>Benecke</u>. In this case, there is evidence that Plaintiff's treating physicians diagnosed her with fibromyalgia, but there is minimal, if any, evidence that any physician opined that fibromyalgia limited Plaintiff's residual functional capacity to work. On the other hand, there is substantial evidence in the record supporting the ALJ's RFC analysis. An examining physician, Dr. Khurana, opined that Plaintiff's pain was due to degenerative disc disease and that Plaintiff should "stay active in regards to any activity that she would like to do including aerobics, weights, swimming, or any activity she desires" in an attempt to alleviate this pain. AR at 348-49. Dr. Khurana's belief that Plaintiff was able to engage in these activities supports the ALJ's RFC findings. <u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001) (an examining physician's opinion constitutes substantial evidence when it rests on his own independent examination of the claimant). Likewise, Dr. Sabourin, another examining physician, found that Plaintiff's pain complaints were disproportionate to the physical evidence and opined that "[f]rom the functional orthopedic point of view," Plaintiff had minor limitations and no restrictions on her abilities.[7] AR at 186. Finally, the medical expert, Dr. Morse, concluded upon review of all of Plaintiff's medical records that she retained the RFC that the ALJ ultimately adopted. AR at 585-86[8]; <u>see</u> <u>Tonapetyan</u>, 242 F.3d at 1149 ("[a]lthough the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record"). As previously noted, the ALJ's decision must be supported by substantial evidence, which is "more than a mere scintilla but may be less than a preponderance." <u>Lewis</u>, 236 F.3d at 509 (substantial evidence is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a

---

[7] However, Dr. Sabourin did diagnose "pain syndrome, etiology undetermined" and noted that Plaintiff had "such pain throughout the examination as she hyperventilates and when the exam was done, she started crying." AR at 185-86. He also took pains to note repeatedly that his opinion was based only on an orthopedic examination, which was his only expertise. <u>Id.</u> at 186.

[8] However, when asked by Plaintiff's administrative counsel whether fibromyalgia could exacerbate Plaintiff's experience of pain in her back, Dr. Morse responded "I can't comment." AR at 591.

1   conclusion"). The resolution of evidentiary conflicts is left to the ALJ and the Court must defer

2   to his determination. <u>Id.</u> And where, as here, the evidence reasonably can be construed to

3   support more than one rational interpretation, the court must uphold the ALJ's decision. <u>Batson</u>,

4   350 F.3d at 1193. Given this standard, the Court concludes that it must defer to the ALJ's

5   resolution of the conflicts in the medical evidence and his conclusion that Plaintiff retains some

6   residual functional capacity to work. The consulting and non-examining physician's opinions

7   provide more than a "mere scintilla" of evidence in support of the ALJ's RFC determination and

8   Plaintiff points to no treating physician records specifically refuting this determination. Therefore,

9   the Court finds that the ALJ's physical RFC determination is supported by the requisite "substantial

10  evidence."

11      With regard to the ALJ's mental RFC determination, the ALJ rejected Dr. Mills' "more

12  restrictive assessment"[9] and adopted the assessment of the testifying expert, Dr. Haroun. AR at

13  20. The ALJ rejected Dr. Mills' assessment on the grounds that it "is supported only by checking

14  off of listed mental status findings on a single form, and is unsubstantiated by ongoing progress

15  notes." <u>Id.</u> at 20. Neither of these constitute specific and legitimate reasons, supported by

16  substantial evidence, for rejecting Dr. Mills' assessment. <u>See Ryan</u>, 528 F.3d at 1198.

17      As an initial matter, the form Dr. Mills filled out appears to have been created and provided

18  by the Secretary. It seems disingenuous for the Secretary to provide physicians with an evaluation

19  form and then to hold that any evaluations provided thereon may be wholly discounted. While

20  Defendant is correct that there is Ninth Circuit precedent permitting an ALJ to reject check box

21  reports if they do not contain any explanation of the basis of their conclusions, <u>Crane v. Shalala</u>,

22  76 F.3d 251, 253 (9th Cir. 1996) (citing <u>Murray v. Heckler</u>, 722 F.2d 499, 501 (9th Cir.1983)

23

24  _____

25      [9] Dr. Mills, Plaintiff's most recent treating psychiatrist, completed a Mental Impairment Questionnaire wherein she set forth her observations and conclusions about Plaintiff's symptoms and ability to work. AR at 533-38. Dr. Mills

26  opined that Plaintiff had "extreme" limitations in each of the following three areas: (a) restriction of activities of daily living, (b) difficulties in maintaining social functioning, and (c) difficulties in maintaining concentration, persistence or pace. <u>Id.</u> at 536. She further noted that Plaintiff had suffered four or more episodes of decompensation within

27  a twelve-month period. <u>Id.</u> When asked to describe any additional reasons why Plaintiff would have difficulty working at a regular job on a sustained basis, Dr. Mills wrote "[t]he client is suffering mental problems, including depression

28  and anxiety. The client lacks appropriate interpersonal interaction skills." <u>Id.</u> at 537.

(expressing preference for individualized medical opinions over check-off reports)), that is not the case here.  On the form, Dr. Mills explained that in addition to monthly doctor visits, Plaintiff attended weekly group therapy meetings and weekly individual coaching.  AR at 533.  When asked to "[d]escribe the *clinical findings* including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms," Dr. Mills wrote "[t]his client presented with severe depressed & anxious mood, insomnia, low energy, panic attacks, chronic physical pain, thoughts of suicide and interpersonal relationship problems." Id. Dr. Mills then wrote in her diagnosis of "major depressive disorder, recurrent severe without psychotic features" and noted in the "prognosis" section of the form that "Paxil is not helping. Her prognosis is poor." Id.  Furthermore, contrary to the ALJ's statement, the South Bay Guidance Center did provide records covering Plaintiff's ongoing treatment, under the supervision of Dr. Mills, from April 5, 2004 to July 7, 2004.  AR at 330-38.  Though the handwriting is difficult to decipher, records from April 5, 2004 and June 2, 2004 both seem to reflect the major depressive disorder diagnosis, and Dr. Mills observed in the June 2, 2004 record that Plaintiff is positive for daytime somnolence, low motivation, and low energy, had a panic episode three days prior, and has poor concentration.  Id. at 331, 335.  All of this refutes the ALJ's conclusion that Dr. Mills' evaluation form is supported by nothing more than check box conclusions.  Therefore, the Court finds that the ALJ failed to provide the requisite specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Mills' assessment.

## 2.  Plaintiff's Credibility

One final factor Plaintiff asks the Court to consider in evaluating the ALJ's conclusion at Step Four is the ALJ's discounting of Plaintiff's subjective pain testimony.  Pl.'s Brief at 14-21.

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  However, "[f]or the ALJ to reject the claimant's complaints, [he] must provide 'specific, cogent reasons for the disbelief.'" Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (quoting Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990)).  "Once the claimant produces medical evidence of an underlying impairment, the

[ALJ] may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." <u>Reddick</u>, 157 F.3d at 722 (citing <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1991)); <u>see also</u> <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989) ("That a claimant testifies that his symptom is more disabling than would normally be expected gives no valid reason to discount his testimony"). Moreover, "absent affirmative evidence of malingering, an ALJ cannot reject a claimant's testimony without giving clear and convincing reasons." <u>Vertigan v. Halter</u>, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing <u>Smolen v. Chater</u>, 80 F.3d 1273, 1283-84 (9th Cir. 1996)). As such, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints," because "[g]eneral findings are insufficient." <u>Lester</u>, 81 F.3d at 834; <u>see also</u> <u>Vertigan</u>, 260 F.3d at 1049 ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it").

An ALJ may, however, "disregard self-serving statements made by claimants if it finds them to be incredible on other grounds." <u>Sousa v. Callahan</u>, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting <u>Rashad</u>, 903 F.2d at 1231). Relevant factors in assessing credibility include "the claimant's engagement in activities inconsistent with a claim of disability, an unexplained or inadequately explained failure to seek treatment, or other ordinary methods of credibility determination." <u>Sousa</u>, 143 F.3d at 1243 (quoting <u>Bunnell</u>, 947 F.2d at 346); <u>see also</u> <u>Smolen</u>, 80 F.3d at 1284 (explaining that "ordinary techniques of credibility evaluation" include "the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid"). Ultimately, in order to find Plaintiff's testimony unreliable, the ALJ is required to make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [Plaintiff's] testimony." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958 (9th Cir. 2002). The ALJ's credibility determination should be given "great weight," <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1985), and the court may not engage in second-guessing if the ALJ's finding is supported by substantial evidence, <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039 (9th Cir. 2008), but it is error for a district court to affirm an ALJ's credibility decision based on evidence that the ALJ did not

1  discuss, <u>Connett v. Barnhart</u>, 340 F.3d 871, 874 (9th Cir. 2003).

2      In discounting Plaintiff's pain allegations, the ALJ explained as follows:

3      Even though it is likely the claimant experiences some intermittent pain and
       limitations, the undersigned finds the claimant's allegations regarding the intensity,
4      persistence, and limiting effects of her pain to be in excess of the objective medical
       findings, and not credible to the extent alleged, for the clear and convincing reasons
5      enumerated below.  First, while the medical record does demonstrate the presence
       of an underlying medically determinable impairment that could reasonably cause
6      mechanical pain, the objective findings with respect to the claimant's
       musculoskeletal complaints are not indicative of intractable pain.  The claimant has
7      retained normal range of motion of all joints, and there is no neurological deficit or
       spasm.  Second, the claimant has required only conservative treatment, and has
8      achieved some relief with medication.  There is no evidence of side effects from the
       medications that she has been taking.  Third, the claimant has not participated in
9      any significant pain regimen or therapy program.  Fourth, there is no evidence that
       she has needed assistance from others in attending to personal needs or in
10     performing essentially all normal activities of daily living.  Fifth, there is no evidence
       of severe weight loss because of loss of appetite from pain, and no evidence of
11     severe sleep deprivation because of pain.  Sixth, the claimant has admitted in
       statements about her daily activities that she remains capable of activities
12     consistent with medium work, in spite of her subjective complaints.  Seventh, there
       is no statement by a physician that the claimant has experienced severe and
13     unremitting pain.  In fact, at least one examining physician has stated that the
       claimant's complaints are disproportionate to objective findings.  Consequently, the
14     claimant's allegations of disabling pain, excess pain, and limitation, when considered
       pursuant to the law of the Ninth Circuit Court of Appeals, and Social Security Rule
15     96-7p, are not credible to the extent alleged.

16  AR at 22.  Plaintiff challenges the ALJ's first, second, third, and seventh reasons for discounting

17  her testimony.[10]

18      With regard to the ALJ's conclusion that the objective findings as to Plaintiff's

19  musculoskeletal complaints are not indicative of intractable pain, Plaintiff argues that Social

20  Security Ruling 96-7p counsels against using this as a basis for discounting her credibility.  Pl.'s

21  Brief at 15.  Within the fourth listed "Purpose" of the ruling, Social Security Ruling 96-7p states

22  "[a]n individual's statements about the intensity and persistence of pain or other symptoms or

23  about the effect of the symptoms have on his or her ability to work may not be disregarded solely

24  because they are not substantiated by objective medical evidence."  SSR 96-7p (July 2, 1996).

25  While Plaintiff is correct that lack of objective findings cannot form the sole basis for rejecting pain

26

27      [10]  Plaintiff also objects to the ALJ's fourth and sixth reasons, but references only inadmissible evidence (new
    records the Court cannot consider) and evidence that she did not file with her motion in support of her arguments.
28  <u>See</u> Pl.'s Brief at 14-15.  The Court, therefore, will not address these arguments.

1  testimony, it is a factor the ALJ may consider in reviewing the record as a whole.  See id. (under

2  the heading "Medical Evidence," the ruling explains that "the absence of objective medical

3  evidence supporting an individual's statements about the intensity and persistence of pain or

4  other symptoms is only one factor that the adjudicator must consider in assessing an individual's

5  credibility and must be considered in the context of all the evidence"); Burch v. Barnhart, 400

6  F.3d 676, 681 (9th Cir. 2005).   Here, substantial evidence in the record supports the ALJ's

7  conclusion.   For example, both Dr. Khurana and Dr. Sabourin observed that Plaintiff's muscle

8  strength was normal[11] (AR at 185, 348), which indicates that Plaintiff has not experienced

9  prolonged pain to a disabling degree.  See Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999)

10  (rejecting claimant's claim that constant pain required her to lie in a fetal position all day where

11  claimant did not exhibit muscular atrophy, which would be a physical sign of a totally

12  incapacitated individual); see also AR at 343 (Dr. McKennett's report indicates that no muscular

13  deterioration was noted).   Likewise, despite Plaintiff's complaints of significant pain, Doctors

14  Khurana, Sabourin, and McKennett all noted upon examination that Plaintiff was "in no acute

15  distress."  AR at 183, 342, 348.  Given the totality of the record, the Court finds that substantial

16  evidence supported the ALJ's decision.

17      Plaintiff's objections to the ALJ's other three conclusions interrelate.  See Pl.'s Brief at 16-

18  18.  The ALJ discounted Plaintiff's testimony because she only required conservative treatment

19  and achieved some relief with medication, she has not participated in any significant pain regimen

20  or therapy program, and there is no statement by a physician that the claimant has experienced

21  severe and unremitting pain.  AR at 22.  In response, Plaintiff points out that she has tried a vast

22  array of medications and has undergone numerous pain therapies and treatments over the years

23  in an attempt to alleviate her pain.  Pl.'s brief at 16-18.  She also highlights that she was told that

24

25

26

27

28      [11] Though the handwriting is difficult to read and the notes are cryptic, it appears Dr. Jaffe came to the same
conclusion, noting that Plaintiff's "motor/sensory intact bilat."  AR at 250.

1    surgery was not an option because Dr. Khurana did not believe it would be effective.[12]  Pl.'s Brief

2    at 16-17.  It is true that doctors have prescribed numerous pain medications and the record

3    reflects that Plaintiff's pain was treated and/or examined with epidural steroid injections, physical

4    therapy, traction, use of a TENS unit, stretching exercises, discograms, electroacupuncture,

5    bilateral intra-articular face joint injections, a bilateral diagnostic sacroilac joint injection, and

6    MRIs.  However, Plaintiff also has reported that some of the medications and treatments helped.

7    See e.g. AR at 230 (Plaintiff reported to Dr. Khurana that medications, including Vicodin, help her

8    symptoms and that "[s]he has had two epidurals, facet blocks and bilateral sacroiliac blocks which

9    provided some improvement"); AR at 572-73 (Plaintiff's testimony that Sylindac and Flexoril

10   helped her back pain, though she has been unable to obtain these medications since her

11   insurance ran out).  Additionally, Dr. McKennett's records reflect that Plaintiff reported not taking

12   any pain medications at all between January of 2004 and August 24, 2004.  AR at 341.  What also

13   is evident from these records is that no doctor has concluded that no further treatment options

14   exist for Plaintiff.  To the contrary, her treating physicians continue to try new medications and

15   treatments and, as the ALJ said, they continue to recommend conservative options such as

16   exercise and physical therapy.  See e.g. AR at 348 (Dr. Khurana recommended weaning off

17   narcotics and trying swimming, aerobics, weights, etc.); AR at 343 (Dr. McKennett referred

18   Plaintiff for water exercise and physical therapy); AR at 238 (Dr. Jaffe recommended that Plaintiff

19   read John Sarno's book Mind-Body Connection).  Evidence of conservative treatment is a sufficient

20   basis for discounting a claimant's testimony regarding the severity of an impairment.  Parra v.

21   Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (citing Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir.

22   1995) (finding that conservative treatment suggested "a lower level of both pain and functional

23   limitation")).  There also is no evidence that any physician has concluded that Plaintiff's pain is

24   completely debilitating, such that a return to work would be impossible regardless of the

25

26

27        [12]  Plaintiff also alludes to references that explain that fibromyalgia's cause is unknown and that is difficult
     to treat.  While this is true, see e.g. Benecke, 379 F.3d at 590 (explaining that "fibromyalgia's cause is unknown, there
28   is no cure, and it is poorly-understood within much of the medical community"), there is no evidence in the record
     that fibromyalgia affected Plaintiff's RFC.

treatment.  All of this supports the ALJ's conclusion that while Plaintiff likely experiences some intermittent pain and limitations, her allegations regarding the intensity, persistence, and limiting effects of her pain are not wholly credible.  See AR at 22.

In view of the totality of the record, the Court finds that the ALJ provided clear and convincing reasons for discounting Plaintiff's testimony.  As the Ninth Circuit clearly has explained,

> It may well be that a different judge, evaluating the same evidence, would have found [the claimant's] allegations of disabling pain credible. But, as we reiterate in nearly every case where we are called upon to review a denial of benefits, we are not triers of fact. Credibility determinations are the province of the ALJ.  (internal citation omitted).  Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision.

Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  The ALJ's credibility determination is entitled to "great weight," Nyman, 779 F.2d at 531, and this Court finds no basis for disturbing the ALJ's conclusion in this case.

In summary, the Court finds that the ALJ did not err in handling Dr. Jaffe's fibromyalgia diagnosis and determining Plaintiff's physical RFC or in discounting Plaintiff's testimony regarding her pain and limitations.  However, the ALJ erred with regard to Plaintiff's mental RFC because he failed to provide the required "specific and legitimate reasons, supported by substantial evidence" for discounting Plaintiff's treating psychiatrist's assessment.  See Turner, 613 F.3d at 1222; 20 CFR § 404.1527(d)(1).

### E.   Step Five

At the fifth and final step of the disability determination, the ALJ assessed whether work existed in the national and regional economy that, given her RFC[13], Plaintiff could perform.  20 C.F.R. § 416.920(a)(4)(v).  Based on the VE's testimony, discussed *supra*, the ALJ held that Plaintiff could work as a sweeper/cleaner, textile stuffer, or bench hand, and that thousands of these positions existed in the San Diego region and tens of thousands to millions existed

---

[13] Again, the ALJ determined that Plaintiff possessed the RFC to "lift and/or carry up to 25 pounds frequently or 50 pounds occasionally; to sit, stand, or walk about six hours each in an eight-hour day; and to occasionally climb, balance, stoop, kneel, crouch, or crawl."  AR at 23.  He further found her "limited to simple repetitive tasks in a non-public setting."  Id.

1   nationally.  AR at 23.  Thus, the ALJ concluded that Plaintiff was not disabled.

2          In light of the Court's conclusion that the ALJ improperly discounted Dr. Mills' assessment

3   of Plaintiff's mental limitations and that, therefore, the RFC determination was not supported by

4   substantial evidence, the Court finds that the ALJ's step five conclusion, which relies on the RFC

5   determination, also is incorrect.

6   ///

7   **IV.    Remand v. Reversal**

8          "The decision whether to remand for further proceedings or simply to award benefits is

9   within the discretion of [the] court." <u>McAllister v. Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989).

10  "Remand for further administrative proceedings is appropriate if enhancement of the record would

11  be useful." <u>Benecke</u>, 379 F.3d at 593.  On the other hand, if the record has been fully developed

12  such that further administrative proceedings would serve no purpose, "the district court should

13  remand for an immediate award of benefits." <u>Id.</u>  "More specifically, the district court should

14  credit evidence that was rejected during the administrative process and remand for an immediate

15  award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the

16  evidence; (2) there are no outstanding issues that must be resolved before a determination of

17  disability can be made; and (3) it is clear from the record that the ALJ would be required to find

18  the claimant disabled were such evidence credited." <u>Id.</u> (citing <u>Harman v. Apfel</u>, 211 F.3d 1172,

19  1178 (9th Cir. 2000), <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002), and

20  <u>Smolen</u>, 80 F.3d at 1292).

21         Where the ALJ's error was in failing to offer sufficiently specific and legitimate reasons for

22  rejecting a treating physician's opinion, the Ninth Circuit's legal precedent is somewhat conflicting.

23  As a judge in the Central District of California has pointed out,

24              The Ninth Circuit sometimes has directed the award of benefits where the
            administrative decision has failed to provide sufficient justification for disregarding
25          a treating physician's opinion. *See Smolen v. Chater,* 80 F.3d 1273, 1291-92 (9th
            Cir.1996); *Lester v. Chater, supra,* 81 F.3d at 834; *Rodriguez v. Bowen,* 876 F.2d
26          759, 763 (9th Cir.1989); *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir.1988);
            *Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir.1987); *Fife v. Heckler,* 767 F.2d
27          1427, 1431 (9th Cir.1985); *Bilby v. Schweiker,* 762 F.2d 716, 719-20 (9th Cir.1985);
            *see also Pitzer v. Sullivan,* 908 F.2d 502, 506 (9th Cir.1990) (directing award of
28          benefits where the administrative decision gave no reasons for disregarding an

examining physician's opinions). Some of these decisions appear to acknowledge the Court's discretion to remand for further administrative proceedings. *Rodriguez, supra; Winans, supra; Sprague, supra; Bilby, supra.* The recent decisions in *Lester* and *Smolen* do not do so, however. [footnote omitted] The *Lester* decision declares that "[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.' " *Lester, supra* at 834. Yet, the Ninth Circuit did not credit the treating physicians' opinions as a matter of law in *Salvador* or *McAllister,* despite the Administration's failure to provide adequate reasons for rejecting the physicians' opinions in those cases. Thus, the Ninth Circuit decisions conflict, leaving this Court to "make the unsatisfactory choice between two opposing lines of authority, neither of which has an unimpaired claim to being the law of the circuit." *Greenhow v. Secretary,* 863 F.2d 633, 636 (9th Cir.1988), *overruled in part, United States v. Hardesty,* 977 F.2d 1347 (9th Cir.1992) ( *en banc* ), *cert. denied,* 507 U.S. 978, 113 S.Ct. 1429, 122 L.Ed.2d 797 (1993) (overruling *Greenhow* to the extent *Greenhow* held that a Ninth Circuit panel may choose between the opposing lines of Ninth Circuit authority without calling for *en banc* review).

The present case may be distinguished from those cases in which the ALJ failed to state *any* reasons for rejecting the physician's opinion. *See Pitzer, supra; Winans, supra; Fife, supra.* Here, the ALJ did not ignore the legal requirement of a statement of reasons. The ALJ erred because at least some of the stated reasons are legally insufficient. Such good faith errors inevitably will occur. Reasonable judicial minds sometimes will disagree regarding proper application of the rather imprecise standard of "specific, legitimate" reasons. The *in terrorem* impact of automatic reversal [footnote omitted] would be misdirected in the present case.

In some cases, automatic reversal would bestow a benefits windfall upon an undeserving, able claimant. The operative medical opinion may be flawed, baseless or otherwise erroneous. Nevertheless, under the rule in *Lester,* the opinion will trigger benefits whenever the ALJ's previously *stated* [footnote omitted] reasons for rejecting the opinion fall short of the ill-defined "specific, legitimate" standard. A reviewing court should have discretion to avoid this inequitable result by remanding the case for further administrative proceedings. Remand necessitates delay, but the cost of this delay should be balanced against the risk of an erroneous determination.

Barbato v. Comm'r of Social Sec. Admin., 923 F. Supp. 1273, 1277-78 (C.D. Cal. 1996). And, the Central District is correct that neither Salvador nor McAllister has been overruled.

However, in a subsequent case addressing similar facts, the Ninth Circuit refused to remand a case solely in order to allow the ALJ the opportunity to elucidate better reasons for rejecting the treating physician's testimony. See Harman, 211 F.3d at 1178-1179. Specifically, the court explained:

[E]ven assuming arguendo that there is material in the record upon which the ALJ legitimately could have rejected Dr. Fox's testimony, the Commissioner's attempt to distinguish *Lester* is not well founded. In *Varney v. Secretary of Health and Human Services (Varney II),* 859 F.2d 1396 (9th Cir.1988), this court addressed the propriety of adopting the Eleventh Circuit's practice of accepting a claimant's pain testimony as true when it is inadequately rejected by the ALJ. In language which

is equally applicable here, we stated:

> Requiring the ALJs to specify any factors discrediting a claimant at the first opportunity helps to improve the performance of the ALJs by discouraging them from reach[ing] a conclusion first, and then attempt[ing] to justify it by ignoring competent evidence…. [¶ And] the rule [of crediting such testimony] ensures that deserving claimants will receive benefits as soon as possible….
>
> .. Certainly there may exist valid grounds on which to discredit a claimant's pain testimony…. But if grounds for such a finding exist, it is both reasonable and desirable to require the ALJ to articulate them in the original decision.

*Id.* at 1398-99. (Emphasis added; internal quotes and citation omitted).

Our reliance on *Varney II* to justify the current application of *Smolen* does not obscure the more general rule that the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings. *See Lewin v. Schweiker,* 654 F.2d 631, 635 (9th Cir.1981). Rather, the *Smolen* test[14] still enables only a limited exception to the general rule.

We conclude that if the *Smolen* test is satisfied with respect to Dr. Fox's testimony, then remand for determination and payment of benefits is warranted regardless of whether the ALJ *might* have articulated a justification for rejecting Dr. Fox's opinion.

<u>Id.</u> (concluding that the <u>Smolen</u> test was not satisfied and that crediting Dr. Fox's testimony did not mandate an immediate award of benefits).  While <u>Harman</u> left it somewhat unclear whether the district court was required to credit the treating physician's opinion *before* applying the <u>Smolen</u> test or only required to credit the treating physician's opinion *if* the <u>Smolen</u> test was satisfied, subsequent cases have made clear that the Court retains discretion in this area.  In <u>Vasquez v. Astrue</u>, 572 F.3d 586, 593 (9th Cir. 2009), the Ninth Circuit acknowledged that there is a split in authority in the Circuit over whether the "credit-as-true" rule is mandatory or discretionary (though the Court declined at that time to resolve the split).  Last year, the Ninth Circuit specifically concluded that "applying the ["credit-as-true"] rule is not mandatory when, even if the evidence at issue is credited, there are 'outstanding issues that must be resolved before a proper disability determination can be made.'"  <u>Luna v. Astrue</u>, 623 F.3d 1032, 1035 (9th Cir. 2010) (quoting <u>Vasquez v. Astrue</u>, 572 F.3d 586, 593 (9th Cir. 2009)); <u>see also</u> <u>Shilts v.</u>

---

[14] The "<u>Smolen</u> test" refers to the three-part test, described *supra*, in <u>Benecke</u>.

<u>Astrue</u>, 400 Fed. Appx. 183, 184-85 (9th Cir. Oct. 18, 2010) (explaining that "evidence should be credited as true and an action remanded for an immediate award of benefits *only if* [the <u>Smolen</u> test is satisfied]").   The Court in <u>Luna</u> found that an outstanding question of when Luna's disability began remained, which the evidence she wanted credited did not answer, and that the district court, therefore, did not err in remanding for further proceedings because the "application of the [credit-as-true] rule would not result in the immediate payment of benefits."   <u>Id.</u> (quoting <u>Vasquez</u>, 572 F.3d at 593).

In the instant case, the Court does not find it appropriate to fully credit Dr. Mills' opinion and remand for an immediate payment of benefits because, even if Dr. Mills' opinion were credited, two outstanding issues remain.   Specifically, it is not clear when Plaintiff became disabled and whether she may still be expected to improve with treatment.   While Dr. Haroun, the psychiatric expert with whom the ALJ concurred in rejecting Dr. Mills' assessment, testified that Plaintiff would meet a listing if Dr. Mills' opinion were credited[15], neither he nor Dr. Mills indicated at what point Plaintiff decompensated to this level.   Dr. Mills only began treating Plaintiff in April of 2004 (seven months before the hearing), so her decline to a listing level may have been

---

[15]   Dr. Haroun testified as follows under questioning from Plaintiff's attorney:

Q      Dr. Haroun, you have reviewed the Exhibit 18F, the medical impairment questionnaire, completed by Dr. Mills, is that correct?

A      Yes, I have.

Q      Okay.  And Dr. Donna Mills is the treating psychiatrist, is that correct?

A      Yes, she is.  That's correct, yes.

Q      And she, she has spent a lot of — she has seen claimant many more times than the CE [consultative examining] psychiatrist, is that correct?

A      Yes, I'm sure she has.

Q      Okay.  And, according to the answers on this questionnaire, isn't it true that claimant would meet the listing for 1204?

A      Yes, that's true.

AR at 598-99.

fairly recent.  Additionally, Dr. Mills indicated on the questionnaire that, though Paxil had not been working, she was starting Plaintiff on Wellbutrin.  AR at 533.  There is no indication in the record of whether the Wellbutrin caused improvement in Plaintiff's condition.[16]  Thus, the evidence before the Court does not make clear that Plaintiff's condition satisfies the SSA's twelve-month durational requirement.  Accordingly, this Court **RECOMMENDS** that the case be **REMANDED pursuant to sentence four of 42 U.S.C. § 405(g)** for a new hearing before an administrative law judge for further consideration consistent with this opinion.

### CONCLUSION

For the reasons set forth above, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED IN PART,** Defendant's cross-motion for summary judgment be **DENIED**, and the case be **REMANDED pursuant to sentence four of 42 U.S.C. § 405(g)** for a new hearing before an administrative law judge.  See 42 U.S.C. § 405(g).  The Court also **DENIES** Plaintiff's requests for a *de novo* hearing and to have new evidence considered.

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation must be filed with the Court and served on all parties **no later than December 21, 2011.**  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties **no later than January 11, 2012**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

DATED:  November 30, 2011

Barbara Major

BARBARA L. MAJOR
United States Magistrate Judge

---

[16]  At the hearing, Plaintiff testified that she only had been taking Wellbutrin for "a couple weeks."  AR at 579.